AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with Facebook<br>User ID #100058668091242<br>that is stored at premises controlled by Facebook | )<br>)<br>)<br>)<br>)<br>)   Case No.   **21-MJ-0771** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 2252 & 2252A<br>18 USC 2422 | Certain activities relating to materials involving sexual exploitation of minors and child pornography; Coercion/Enticement |

The application is based on these facts:

See Attached Affidavit of Special Agent, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Angela M. Forbes*
_____
*Applicant's signature*

Special Agent Angela M. Forbes, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: ___3/2/2021___

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Karen S. Crawford, United States Magistrate Judge
_____
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>

I, Angela M. Forbes upon being duly sworn do hereby state that the following is true to my knowledge and belief:

## <u>INTRODUCTION</u>

1.     I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) within the Department of Homeland Security (DHS), having been so employed since June 2010.  I am currently assigned to the HSI Special Agent in Charge  San Diego, California Child Exploitation group. I have attended and successfully completed the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training located at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.     I am currently assigned to the Internet Crimes Against Children (ICAC) Task Force in San Diego. This task force includes members of the San Diego Police Department, San Diego County Sheriff's Department, U.S. Postal Inspection Service, U.S. Probation, Federal Bureau of Investigation, Naval Criminal Investigative Service, U.S. Attorney's Office and the San Diego County District Attorney's Office.  Prior to becoming a SA, I was employed as a Criminal Investigator for the Department of the Navy for approximately seven years. I have previously received training from other law enforcement agencies in the area of child pornography investigations. As an HSI SA assigned to the Child Exploitation group, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252, and online enticement crimes in violation of 18 U.S.C. § 2422.   I have participated in the service of numerous search warrants involving child

exploitation and/or child pornography offenses and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media. As a federal agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. In preparation of this affidavit, I have discussed the facts of this case with other law enforcement agents and officers within HSI and the ICAC task force.

3.     This affidavit is made in support of an application for a warrant to Facebook, Inc., 1601 Willow Road, Menlo Park, California, 94025, within the Northern District of California, as described in Attachment A, for search of the account associated with Facebook User ID 100058668091242 (**Subject Account**) from November 1, 2020 to the present, for items that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252, 2252A, and 2422, as described in Attachment B.

4.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## BACKGROUND ON FACEBOOK

5.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.   Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

6.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

7.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.   A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."   If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.   Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

8.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.   By adjusting these privacy settings, a Facebook user can make information available

only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

9.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.

10.    Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as

well as all photos and videos uploaded by any user that have that user tagged in them.

12.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook may not record the calls themselves, it does keep records of the date of each call.

13.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

15.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook

page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

18.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

19.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

20.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past

event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

22.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

23.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and

information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

26.    On March 4, 2009, a state search warrant was executed on the San Diego County residence of William Luksic by the ICAC task force.  Numerous devices were seized and forensically searched.  Approximately two months later, Luksic was charged by federal complaint with possession of child pornography for possessing images of children engaged in sexually explicit conduct.  The complaint confirmed that the investigation into Luksic began because he was engaged in online communications with a minor male.  Those conversations were reported by the minor male to be sexual in nature and involved the exchange of nude images.

27.    Luksic plead guilty to distribution of child pornography in violation of violating 18 U.S.C. § 2252(a)(2) and sentenced to 144 months in custody (09cr02197-WQH).

28.    In July 2019, Luksic was released from prison and became subject to his terms of supervised release for a period of 10 years.  These terms included a search condition, requiring him to submit to searches by any law enforcement officer based on reasonable suspicion that he has violated his terms of release. The terms also included a requirement that he refrain from owning or using any unapproved computer devices or phones, and that he consent to the installation of monitoring software on any computers or devices owned by him.

29.    In December 2019, a petition was filed by U.S. Probation alleging that Luksic had violation numerous conditions of supervised release, including possession of unauthorized devices, and accessing the internet without permission. On June 22, 2020, Luksic admitted to those violations (among others) and was

given a time-served sentence.  He was placed on the same terms and conditions of supervised release for another 10 years.

30.    On January 7, 2021, U.S. Probation Officers conducted a home inspection of Luksic, at his residence in Encinitas, California.  Upon arrival, Luksic  permitted the officers to search his belongings without any issue.  U.S. Probation Officers discovered unauthorized devices in Luksic's possession, including a NUU Mobile cell phone (Target Device). Luksic admitted to hiding the Target Device from U.S. Probation Officers on previous inspections and for using the Target Device to communicate with individuals via Facebook using the **Subject Account**.

31.    Pursuant to the supervised release conditions, the Target Device was manually examined and was also subjected to a Cellebrite examination to review the contents.  During their review of the Target Device, U.S. Probation officers discovered the **Subject Account** as an active Facebook account and over 41,000 images including various depictions of individuals engaged in sexually explicit conduct.  The brief review of the **Subject Account** revealed multiple chat threads with individuals who stated to Luksic they were under the age of 18 and whose profile pictures appeared to be of possible minors.

32.    On January 23, 2021, HSI SA Cesar Valdivia, while assigned to the HSI San Diego Child Exploitation Group and a full-time member of the ICAC Task Force, responded to the U.S. Probation office to review an initial analysis of the Target Device.  SA Valdivia observed one thumbnail image discovered in the image gallery on the Target Device which he identified as child pornography.  The image depicts a prepubescent male lying on his back, wearing what appears to be a green t-shirt, and he is nude from the waist down with his legs spread open,

completely exposing his genitals and anus in a lewd and lascivious manner.  The focus of the photograph is centered on the pre-pubescent males' genitals and anus.

33.   SA Valdivia discovered two Facebook Messenger chat threads between Luksic, using the **Subject Account**, and minor boys.  As the individuals Luksic was communicating with all appear to be minors, I am using their initials to protect their identity.  The following are excerpts from the chat threads:

**December 21, 2020**

| | | |
|---|---|---|
| J.C.S. : | Btw am 15 yrs and am from London |
| LUKSIC: | Thank you I need to get more pictures I had a dozens and dozens of pictures I've taken but I lost all of them in the flood |
| J.C.S.: | (Sent a sticker but SA Valdivia was unable to view it.) |
| LUKSIC: | You're 15 that's a surprise I thought you're much older you're interest level is much older than 15 |
| J.C.S.: | Yeah |
| LUKSIC: | But I mean to say is it's nice to see someone who has a greater interest in life than just sex But I think sex is a lot of fun too |
| J.C.S.: | (Sent a sticker but SA Valdivia was unable to view it.) R u single |
| LUKSIC: | Yes I am and I'm glad to see me think I like and that score too |
| J.C.S.: | Yeah |
| LUKSIC: | I hope you get your coronavirus shot pretty soon the sooner the better |
| J.C.S.: | (Sent a sticker but SA Valdivia was unable to view it.) |

| | | |
|---|---|---|
| LUKSIC: | It's nice to see someone who hasn't who has more interest in the light in life than just sex |
| | That's a very confusing message I just left |

**December 29, 2020**

LUKSIC: your story looks like it's kind of cute but I would understand it a lot better if I could understand Spanish as well as you speak Spanish

D.M.: Eh.. yeah…I speak Spanish

Who are you?

And…where are you?

LUKSIC: You can call me Bill and I live in San Diego California actually more like 25 miles north of San Diego right on the coast in a town called Encinitas

D.M.: I'm [D][1]

I'm from Colombia

And I'm 15 years old

Nice to meet you

I'm from Colombia

LUKSIC: Very nice to meet you and I'm sure you're absolutely beautiful

D.M.: Oh thank you

34.   Based on the discovery of the Target Device and its contents, U.S. Probation Officers filed a petition with the court and a warrant was issued for Luksic's arrest.  He was taken into custody on January 28, 2021 and remains in federal custody on charges related to the violation of his terms of release.

35.   As a result of my training and experience in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt, distribution and possession of child pornography.

a.   These individuals may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasizing while viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.   These individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, sliders and/or drawings or other visual media. These individuals often use these materials for their own sexual arousal and gratification. Furthermore, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   To the extent these individuals possess and maintain "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., they almost always maintain those hard copies in the privacy and security of their home. They typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and video tapes for many years. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in

---

[1] The minor identifies his first name.

13

minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d.      Likewise, these individuals often maintain their digital or electronic collections of child sexual exploitation images in a safe, secure, and private environment, such as a computer and surrounding area, or on cellular telephones. These collections are often maintained for several years and are kept close by, usually at the individual's residence, on his or her person, or in his or her vehicles, to enable the individual to view the collection, which is valued highly.

e.      These individuals also may correspond with and/or meet others to share information and materials; are rarely able to completely destroy correspondence from other child pornography distributors/collectors; conceal correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.      These individuals prefer not to be without their child sexual exploitation images for any prolonged time period. Collectors will take their collection with them if they change residences, as the collection is considered to be a prized possession. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. That said, there are individuals with a sexual interest in children who download and view digital images of child sexual exploitation and delete it in order to avoid detection by law enforcement or other people. However, even in cases where these images are deleted, or concealed via encryption software, forensic examiners can use specialized tools to recover the deleted files or access encrypted files.

g.      These individuals often use specialized software to conceal the existence of evidence and/or destroy said evidence. There are a variety of different

programs that an individual can use to accomplish these objectives, many of which are free. Additionally, these individuals have been known to store child pornography in unconventional physical locations, as well as in unusual digital locations on computers and cellular phones. These files and folders, or applications, have been misnamed or renamed in an attempt to mislead investigators.

h.     These individuals will often download and store images of children they know or with whom they have communicated, as well as their communications with those children. The images may not necessarily be pornographic or obscene in nature; however, they are often used for the individuals' sexual gratification.

36.    Based on the facts set forth in this affidavit, along with his criminal history, I believe Luksic exhibits the common characteristics described above of someone involved in the receipt, possession, and accessing of child pornography, engaging in online sexual communications with minors  as he has a demonstrated sexual interest in minors.  His history includes of contacting minors and engaging in sexual discussions with them, and his attempts to conceal his activities are further evidence of his criminal activity.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

37.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Facebook, Inc. are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook.  The impact on Facebook's business would be disruptive and severe.

38.     Therefore, I request authority to seize all content from the Facebook account as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the privacy of Facebook's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, authorization is sought to allow Facebook to make digital copies of the entire contents of the account subject to seizure.  The copies will be provided to me or to any authorized federal agent.  The copies will be imaged, and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

39.     Analyzing the data to be provided by Facebook may require special technical skills, equipment, and software.  It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Facebook does not always organize the

electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

40.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Facebook, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

41.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all communications that identify any users of the subject account and any communications sent or received in temporal proximity to incriminating communications that provide context to the incriminating communications.

42.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PROCEDURES TO PROTECT THIRD PARTY PRIVACY**

43.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant. In the event that the personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of the warrant such information will not be used in any way except to obtain a new warrant authorizing

a search for such information. In the event a new warrant is obtained, the government may make use of the data seized in any lawful manner. Absent a new warrant, the personnel conducting the analysis may continue to search and seize data only within the scope of this warrant.

## PRIOR ATTEMPTS TO OBTAIN DATA

44.     The United States has conducted a forensic preview of the NUU cell phone, which revealed partial Facebook message threads.

## GENUINE RISKS OF DESTRUCTION

45.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, a preservation letter was sent to Facebook on or about January 19, 2021, for preservation of the Subject Account.

## CONCLUSION

46.     Based on the aforementioned factual information, there is probable cause to believe that evidence, fruits, and instrumentalities of violation of 18 U.S.C. §§ 2252, 2252A and 2422, may be located on the seized items described in Attachment A.  I, therefore, respectfully request that the attached warrant be issued authorizing the seizure of the items listed in Attachment B.


*Angela M. Forbes*
Angela M. Forbes, Special Agent
Homeland Security Investigations

18

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of March, 2021.

_____
HONORABLE KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

Facebook, Inc. is located at 1601 Willow Road, Menlo Park, CA 94025. This warrant applies to information associated with the following Facebook user ID:

**100058668091242**

# ATTACHMENT B

I.    Service of Warrant

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files relevant to attachment A and copy them onto removable electronic storage media and deliver the same to the officer or agent.

II.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including EXIF data;

d. All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends'

Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.   All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All information about the user's access and use of Facebook Marketplace;

m.   The types of service utilized by the user;

n.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

III.  <u>Information to be seized by the government</u>

The search of the data supplied by Facebook pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant, and to the seizure of the following information involving Facebook user ID **100058668091242** from November 1, 2020, to the date of the warrant:

a.  Communications, records, and attachments tending to discuss the sexual exploitation of children, demonstrate a sexual interest in children, and/or demonstrate the possession, receipt, and distribution of child pornography and coercion/enticement, in violation of 18 U.S.C. §§ 2252, 2252A, and 2422;

b.  Communications, records, and attachments tending to identify the user of the account and any co-conspirators involved in the activities described in Paragraph III.a. above; and

c.  Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

All of which constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 2252, 2252A, and 2422.